| | |
|---|---|
| DISTRICT COURT, CHAFFEE COUNTY<br>STATE OF COLORADO<br>142 Crestone Avenue<br>Salida, Colorado 81201 | DATE FILED: December 10, 2020 1:55 PM<br>FILING ID: 3F800200C2A68<br>CASE NUMBER: 2020CV30050 |
| Plaintiff: LYNDA HERRERA TRAVIS, an individual,<br><br>v.<br><br>Defendant: CITY OF SALIDA, a municipal corporation. | ▲ COURT USE ONLY ▲ |
| <u>Attorneys for Plaintiff</u>:<br>Jason B. Wesoky, Reg. No. 34241<br>D. J. Marcus, Reg. No. 41189<br>Darling Milligan PC<br>1331 17th Street, Suite 800<br>Denver, CO 80202<br>Phone:     (303) 623-9133<br>Fax:        (303) 623-9129<br>E-mail:    jwesoky@darlingmilligan.com<br>              dmarcus@darlingmilligan.com | Case No:<br><br>Division: |
| **FIRST AMENDED COMPLAINT** | |

Plaintiff, Lynda Herrera Travis, by and through her attorneys Darling Milligan PC, for her complaint against City of Salida, a municipal corporation ("City"), avers as follows:

## GENERAL ALLEGATIONS

1. Plaintiff is an individual residing in Chaffee County, Colorado.

2. The City is a municipal corporation. Upon information and belief, the City has more than 15 employees and is a municipal corporation in the State of Colorado.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to C.R.S. § 13-1-124 as Defendant conducts business within Colorado and the discrimination occurred in Colorado.

1

4.      Venue is proper in Chaffee County pursuant to C.R.C.P. 98 as the City is a municipal corporation located in and conducts its business in Chaffee County and the discrimination occurred in Chaffee County.

## FACTUAL BACKGROUND

5.      Ms. Travis served as the Deputy City Clerk from October 2017 until January 2019.

6.      As the Deputy City Clerk, Ms. Travis reported to the City Administrator.

7.      During Ms. Travis' tenure she reported to three different City Administrators: Larry Lorentzen, Theresa Casey (interim City Administrator), and Drew Nelson.

8.      On June 20, 2018, Ms. Casey met with Ms. Travis. Ms. Travis discussed perceived problems with the city outdoor vending permit system. Ms. Casey suggested that Ms. Travis raise the issue at the department head meeting taking place that day. When Ms. Travis raised the issue at the meeting, Ms. Casey told her that it was not appropriate to raise it at the meeting and that it should be discussed at a later time. Ms. Travis felt humiliated that Ms. Casey told her to raise the issue just to shut her down in public; her anxiety levels rose to the point where she began experiencing a panic attack and had to remove herself from the meeting. Ms. Travis tried to return to the meeting, but her anxiety levels rose again. She had to take the rest of the day off and two further sick days to recover.

9.      On June 25, 2018, after taking two sick days to deal with panic attacks induced by Ms. Casey's antagonistic behavior toward her, Ms. Travis was informed that Ms. Casey inquired of another employee whether Ms. Travis was truly sick or using leave inappropriately. Ms. Casey confronted Ms. Travis and threatened to fire Ms. Travis for using sick leave. This threat induced another panic attack.

10.     On July 23, 2018, Ms. Casey brought Ms. Travis in her office to tell her that Ms. Casey and the Municipal Judge would be a part of the interview and hiring process for the Assistant Deputy City Clerk position, a position that directly reported to Ms. Travis. Ms. Casey told Ms. Travis she was not a department head and that Ms. Casey would take the lead on the hiring process. Ms. Travis could be included in the process; however, the final decision was Ms. Casey's and the Municipal Judge's.

11. On July 30, 2018, Ms. Casey stated she did not perceive the Assistant Deputy City Clerk to be Ms. Travis' employee even though the individual in this position would directly report to Ms. Travis. Additionally, Ms. Casey would not approve of any of the persons Ms. Travis wanted to hire for the position. Ms. Casey recommended the last interviewee of the day.

12. Ms. Travis told Ms. Casey her career goal was to one-day serve as a City Manager. In response, Ms. Casey stated Ms. Travis should stick with being a "cute little deputy" and it would take years for Ms. Travis to master just that.

13. On August 6, 2018, Ms. Casey asked Ms. Travis to move her office to the storage closet. Ms. Casey had discussed this with the Community Development Director, Glen VanNimwegen. Mr. VanNimwegen agreed to assist with the move by clearing out the storage room. Ms. Travis suggested alternative options; however, Ms. Casey did not want to offend another employee by asking her to move her office. After the conversation, Ms. Casey paced in front of Ms. Travis's office wondering to herself, verbally and loudly enough that Ms. Travis could hear, what could be done with the space if the office was vacant.

14. On September 26, 2018, Ms. Casey and Ms. Travis were standing by the printer when Ms. Casey stated she learned a lot about Ms. Travis' culture (Ms. Travis is of Mexican heritage) by watching the Disney movie Coco.

15. After months of working under Ms. Casey in a hostile and harassment filled work environment, Ms. Travis thought the hiring of Mr. Nelson would improve her work environment. Unfortunately, Ms. Travis' work environment got worse.

16. On October 8, 2018 Ms. Travis went to Drew Nelson's office to request he review and approve a meeting agenda. He was sitting at his desk when she approached. Ms. Travis asked if he would be willing to go over the agenda so she could send it out to the department heads. He looked up, with a look of extreme rage, as if to convey Ms. Travis was bothering him. Due to his strong reaction to her request, Ms. Travis said she would come back another time and excused herself from his office.

17. October 10, 2018, Mr. Nelson called Ms. Travis into his office. He pointed to a goals document that he requested she place on the upcoming work session. Ms. Travis was surprised the City Council was interested in revisiting the document. She explained it was a project that she had worked on with the City Council prior to his arrival. Mr. Nelson became enraged and screamed, "What?" he then picked up the document, threw it and said, "Well this is shit!"

3

18. On October 12, 2018 at 5:00 PM, Mr. Nelson sent Ms. Travis packet materials. Minutes after sending the packet material, Mr. Nelson went to her office to ask when the work product would be sent out. Then, Mr. Nelson said he was going to sit in her office to make sure Ms. Travis completed the work. Mr. Nelson stayed in her office, making Ms. Travis extremely uncomfortable, until both Ms. Travis and Mr. Nelson left the office shortly before 8:00 PM.

19. On October 13, 2018, Ms. Travis requested Mr. Nelson meet her at City Hall. Ms. Travis reported to Mr. Nelson that Ms. Casey had been abusive and bullying Ms. Travis. Ms. Travis expressed fear that Mr. Nelson was continuing the same practices. Mr. Nelson said he fully supports Ms. Casey and that he would make up his own mind about her.

20. On October 31, 2018, Ms. Travis requested Mr. Nelson review a meeting agenda. During the review, Mr. Nelson pointed out inconsistences in fonts and spacing. Mr. Nelson requested Ms. Travis make the corrections but then said, "Oh wait, do you even know how to do that?"

21. On November 2, 2018, Mr. Nelson called Ms. Travis as she was walking in the door of her residence; she had come home because she had a female emergency. Mr. Nelson directed her to meet him at Pueblo Bank and Trust immediately. She quickly changed her clothes and went to the bank. Ms. Casey and Mr. Nelson were present at the bank when she arrived. Mr. Nelson coerced Ms. Travis into signing a document.

22. Upon exiting the bank, she confronted Mr. Nelson in the parking lot regarding what had just occurred. Ms. Casey stood next to him and witnessed the interaction. He said he needed to freeze the city bank accounts. Ms. Travis told him he had previously told her that her signature was needed for a different reason. She left the bank very upset and immediately called Mr. Nelson when she arrived home to speak with him again. Mr. Nelson said she could document the event if it made her feel better and said he would include it in her HR file. It was never placed in her HR file.

23. On November 27, 2018, Ms. Travis emailed Mr. Nelson requesting a salary increase and to be considered for the City Clerk position. In the attachment to the email, Ms. Travis detailed her reasons for requesting a salary increase and to be given the opportunity to be considered for appointment to City Clerk[1]. Ms. Travis did

---

[1] The City Clerk position was previously an elected position, however Section 2-3-10 of the Salida Municipal Code ("SMC") was amended as of November 20, 2018 to make it an appointed position. *See* Exhibit 3 (SMC § 2-3-10).

not demand the pay increase or the City Clerk position, a position that *was* legally available.

24. Mr. Nelson did not respond to Ms. Travis' request. She sent a follow up email on November 30, 2018. Ms. Travis never received a response to either email. Mr. Nelson's reason for not responding, "if [he] granted her request it would look like he was buying her support. If he denied it, he worried it would appear retaliatory," therefore Mr. Nelson, the City Administrator, felt that the best action was to just ignore an employee's request.

25. On December 6, 2018, Dan Shore (a City Council Member), strongly encouraged Ms. Travis to write a letter to the Mountain Mail in response to its article *"Council receives letters about Nelson's behavior."* Mr. Shore coached Ms. Travis to make changes to emphasize she had a good working relationship with Mr. Nelson.

26. On December 21, 2018, Mr. Nelson presented Ms. Travis with a General Release and Separation Agreement; if Ms. Travis signed the agreement, she would receive $2,300.00 and a letter of recommendation from the Mayor.

27. Ms. Travis questioned why she was receiving such an agreement and what benefit she would get by signing an agreement which she did not request.

28. Ms. Travis did everything she could to not jeopardize her and her family's future by complying with the City's every demand and wish, even going so far as to try and pacify the City by stating she was resigning voluntarily and trying to help the City demean and undermine former employee Ms. McClurkin.

29. Ms. Travis' professional career and reputation continue to be adversely impacted by the City of Salida. While providing home care for a client in her new position, the client recognized her name from Mountain Mail newspaper articles and subsequently informed Ms. Travis she was friends with Salida City Council member Harald Kasper and his wife, Devon Jencks. She stated Mrs. Jencks had confided in a group of their friends, including her, that Ms. Travis was "crazy."

30. Ms. Travis timely brought a charge of discrimination with the Colorado Civil Rights Division ("CCRD") on the grounds of national origin/ancestry (Hispanic), sex discrimination and for engaging in protected activity, including subjecting her to unequal treatment relative to males and non-Hispanic employees. The CCRD investigated the matter.

31. On July 31, 2020, the CCRD issued a Notice of Right to Sue.

5

32. On November 20, 2020, the EEOC, through the DOJ, issued a right to sue letter.

### First Claim for Relief
### (Discrimination under C.R.S. § 24-34-402(1)(a) *et seq.* and 42 U.S.C. § 2000e, *et seq.* – Sex (Female))

33. Plaintiff incorporates all prior allegations as if fully set forth herein.

34. The foregoing acts and omissions of Defendant's discrimination violate C.R.S. § 24-34-402(1)(a) *et seq*. and 42 U.S.C. § 2000e, et seq.

35. Plaintiff is in protected classes based on her sex (Female).

36. Ms. Travis was qualified for her job as Deputy City Clerk.

37. When Plaintiff complained to the City about her disparate treatment and the treatment she was receiving, the City retaliated against her with continuing such the treatment.

38. Thus, Defendant engaged in discrimination because of Ms. Travis' sex.

39. The discrimination includes the treatment of Ms. Travis that differ from her male counterparts, including, but not limited to, derogatory comments, admonishment for using sick time, harassment, and mistreatment, working late and over the weekend.

40. Plaintiff is entitled to all damages and remedies, including, but not limited to back pay, front pay, reinstatement, punitive damages as permitted by statute, attorney fees and costs.

### Second Claim for Relief
### (Discrimination under C.R.S. § 24-34-402(1)(a) *et seq.* and 42 U.S.C. § 2000e, *et seq.* – National Origin/Ancestry (Hispanic))

41. Plaintiff incorporates all prior allegations as if fully set forth herein.

42. The foregoing acts and omissions of Defendant's discrimination violate C.R.S. § 24-34-402(1)(a) *et seq* and 42 U.S.C. § 2000e, et seq.

43. Plaintiff is in a protected class based on her national origin/ancestry (Hispanic).

44. Ms. Travis was qualified for her job as Deputy City Clerk.

45. When Plaintiff complained to the City about her disparate treatment and the treatment she was receiving, the City retaliated against her with continuing such the treatment.

46. Thus, Defendant engaged in discrimination because of Ms. Travis' national origin/ancestry (Hispanic).

47. The discrimination includes the treatment of Ms. Travis that differ from her non-Hispanic counterparts, including, but not limited to, derogatory comments, admonishment for using sick time, harassment, and mistreatment, working late and over the weekend.

48. Plaintiff is entitled to all damages and remedies, including, but not limited to back pay, front pay, reinstatement, punitive damages as permitted by statute, attorney fees and costs.

### Third Claim for Relief
### (Discrimination under C.R.S. § 24-34-402(1)(a) *et seq.* and 42 U.S.C. § 12203 – Retaliation)

49. Plaintiff incorporates all prior allegations as if fully set forth herein.

50. The foregoing acts and omissions of Defendant's discrimination violate C.R.S. § 24-34-402(1)(a) *et seq.* and 42 U.S.C. § 12203.

51. Plaintiff is in protected classes based on her sex (Female) and national origin/ancestry (Hispanic).

52. Ms. Travis was qualified for her job as Deputy City Clerk.

53. When Plaintiff complained to the City about her disparate treatment and the treatment she was receiving, the City retaliated against her by engaging in and continuing such treatment.

54. The discrimination and retaliation includes but is not limited to, derogatory comments, admonishment for using sick time, harassment, and mistreatment, working late and over the weekend.

WHEREFORE, Plaintiff seeks judgment in her favor and against Defendant for monetary damages in an amount to be determined by a jury and the Court for all damages compensable under the foregoing claims, for all equitable remedies available under said claims, including: back pay (including interest and benefits); compensation for damages sustained as a result of Defendant's conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof; exemplary and punitive damages in accordance with applicable law in an amount commensurate with Defendant's ability to pay and to deter future conduct; costs incurred, including reasonable attorneys' fees to the extent allowable by law; pre-judgment and post-judgment interest, as provided by law; and such other and further legal and equitable relief as this Court deems necessary, just, and proper.

PLAINTIFF REQUESTS A TRIAL BY JURY

Respectfully submitted this 10th day of December 2020.

                                                  DARLING MILLIGAN PC

                                                  */s/ Jason B. Wesoky*
                                                  Jason B. Wesoky, Reg. No. 34241
                                                  D. J. Marcus, Reg. No. 41189
                                                  *Attorneys for Plaintiff*

Plaintiff's Address:
10345 W. Cherokee Drive
Salida, Colorado 81201